UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROSH CONSTRUCTION, INC.<br>103 Norman Road, Suite B<br>Pasadena, Maryland 21122<br><br>Plaintiff | |
| v. | Civil Action No.________ |
| AMEC CONSTRUCTION MANAGEMENT, INC.<br>1633 Broadway, 24th Floor<br>New York, NY 10019<br><br>Defendant | SERVE:<br>Superintendent of Corporations<br>941 N. Capitol Street NE<br>Washington, D.C. 20002 |

**COMPLAINT**

Plaintiff alleges:

1. This is an action to enforce a settlement agreement which is brought by a construction subcontractor against a general contractor. This matter arises out of the renovation and modernization of the Washington, D.C. headquarters buildings of the Interstate Commerce Commission / United States Customs Service and the Connecting Wing between the two structures ("the Project").

2. Plaintiff ROSH Construction, Inc. ("ROSH") is a corporation which is organized and in good standing pursuant to the laws of the State of Maryland, which maintains its principal place of business in Pasadena, Maryland.

3 AMEC Construction Management, Inc. ("AMEC") is a corporation which is organized and in good standing pursuant to the laws of the State of Delaware, which maintains its principal place of business in New York, New York. AMEC is the successor in interest to Morse Diesel International, Inc. ("Morse Diesel").

4. Jurisdiction for this action is founded on diversity of citizenship, 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this Court pursuant to 28 U.S.C. 1391(a)(2), in that the claim arose in the District of Columbia.

6. By Contract No. GS-11P96MKC0015, the United States General Services Agency ("GSA") contracted with Morse Diesel for the work required for the Project.

7. By written agreement dated February 26, 1997, Morse Diesel entered into a Subcontract Agreement with ROSH, pursuant to which ROSH agreed to provide and install door frames, doors, door hardware, and other work.

8. ROSH performed the work within the scope of its subcontract on a timely and workmanlike basis, subject to delays by others.

9. During the performance of the work of the Project certain claims arose on the part of AMEC and AMEC's subcontractors (including ROSH) for extra work directed by GSA, and for delays and Project acceleration to overcome

delays which were the responsibility of GSA, and for remission of Liquidated Damages withheld by GSA.

10. Among numerous claims submitted by ROSH to AMEC for submission in turn by AMEC to GSA was ROSH's delay / acceleration / remission of liquidated damages claim dated March 18, 2002, in the amount of $473,952, a copy of which is appended hereto as Exhibit A. ROSH's claim was supplemented by letter dated December 20, 2002 (Exhibit B).

11. By written agreement dated February 4, 2003, entitled "Settlement Agreement and Release" (Exhibit C hereto), AMEC as the successor in interest to Morse Diesel settled with ROSH all of ROSH's outstanding claims. The parties agreed that AMEC's liability to ROSH thereafter was limited to payments made by GSA to AMEC for ROSH's portion of a number of pending claims.

12. Exhibit A to the Settlement Agreement and Release between the parties, entitled "Joint Prosecution and Close Out Agreement" ("the JPA") provides at paragraph 7:

> *In any and all actions between the parties enforcing or declaring rights under this Agreement, the prevailing party shall be entitled to the award of all costs and expenses (including actual attorneys' fees) incurred and paid in such actions.*

13. In the event plaintiff prevails in this action, plaintiff is entitled as an element of its damages an award of its costs, expenses and attorneys' fees.

**COUNT I – BALANCE DUE ON "DIRECT" CLAIMS**

14. Among ROSH's claims was a group of "direct" claims which AMEC settled with GSA, with ROSH's consent and approval, for $132,762, all of which was immediately due and payable from AMEC to ROSH.

15. On January 16, 2007, AMEC paid ROSH the sum of $111,678 for ROSH's direct claims, holding back $21,084 in legal fees.

16. The legal fees assessed by AMEC in connection with ROSH's direct claims were not for legal services related to such claims, and AMEC had no contractual right to withhold such amount. In fact, the majority of such charges were for work performed by attorney Barbara Werther dealing with litigation between AMEC and ROSH, including the preparation and taking of the deposition of ROSH's President, and for negotiation and documentation of the settlement between the parties. At no time did ROSH agree to reimburse AMEC for legal fees involved in litigating against ROSH.

17. ROSH has made demand of AMEC for the balance due on its direct claims in the amount of $21,084, which AMEC has refused to pay.

**COUNT II – REMISSION OF LIQUIDATED DAMAGES**

18. ROSH restates and incorporates by reference Paragraphs 1-13 hereof, as though fully set out herein.

19. By written agreement entitled "Settlement Term Sheet" (Exhibit D hereto), the parties to AMEC's claims before the General Services Board of Contract Appeals documented a settlement with GSA of AMEC's delay and acceleration claim, in the total amount of $6,700,000.

20. The amount due to ROSH for its share of the remission of Liquidated Damages per the AMEC / GSA settlement is $38,618.

21. ROSH has made demand of AMEC for the amount due to it for remission of Liquidated Damages and AMEC has refused to pay.

**COUNT III – DELAY / ACCELERATION CLAIM**

22. ROSH restates and incorporates by reference Paragraphs 1-13 and 19 hereof, as though fully set out herein.

23. AMEC asserts that the proper methodology by which ROSH's share of the delay / acceleration settlement should be calculated is to take at face value the representations in the Settlement Term Sheet concerning the amounts due to subcontractors, and then to deduct AMEC's attorneys fees and expenses.

24. Even assuming that AMEC's proposed methodology is correct (which ROSH contests), the calculations upon which AMEC based its determination of the amount due to ROSH are erroneous, in that such calculations (1) include a deduction for expenses, which are not reimbursable pursuant to the terms of the Settlement Agreement between AMEC and ROSH; (2) include a deduction for attorneys' fees for services provided by persons other than the "lead legal team," which were the only legal fees ROSH agreed to share the cost of; and (3) include deductions for numerous services not required in order to complete the settlement in question, and for which ROSH has no liability.

25. The proper amount of deductions is $11,888, not the amount claimed by AMEC of $67,002.

26. The proper amount due to ROSH if AMEC's methodology is accepted but excessive charges eliminated is $97,183.

27. ROSH has made demand of AMEC for the payment of $97,183 for its share of the delay / acceleration claim, and AMEC has refused to pay.

**COUNT IV – ALTERNATIVE CALCULATION**
**OF ROSH DELAY / ACCELERATION CLAIM**

28. ROSH restates and incorporates by reference Paragraphs 1-13 and 19 hereof., as though fully set out herein.

29. The Joint Prosecution and Close Out Agreement ("the JPA") provides at paragraph 6 as follows:

> *In the event further proceedings are instituted with respect to Subcontractor's claims against GSA, or in the event of a settlement, AMEC will provide Subcontractor notice of such action within a reasonable time prior to taking such action.*

30. Notwithstanding the foregoing, and in breach thereof, AMEC proceeded to negotiate a settlement with GSA without consulting ROSH. This failure was material, because had ROSH been consulted, ROSH would have contested reducing ROSH's claim by the average amounts deducted from claims that were audited by GSA, and for other reasons.

31. AMEC presented to GSA a proposed allocation of the settlement between AMEC's share and the subcontractors' shares, which was subsequently presented to ROSH and the other subcontractor's as "GSA's allocation" – when in

fact GSA engaged in no critical analysis of the entitlement of the subcontractors, and simply adopted AMEC's proposal exactly as submitted.

32. Each of the allocations to other subcontractors was based solely on the AMEC / subcontractor's contracts. In contrast, the allocation between AMEC and ROSH was governed by a settlement agreement which involved dismissal of a then-pending lawsuit by ROSH against AMEC.

33. The amount AMEC allocated to ROSH, based on a percentage approved by GSA auditors of other subcontractors' claims, was arbitrary, capricious, and in bad faith.

34. The proper methodology for calculation of ROSH's share of the settlement of their delay / acceleration claims, as provided in paragraph 6 of the JPA, is a determination of "the same proportionate share of the award to pay Subcontractor as Subcontractor's proportionate share is of the total claims." The total recovered can be determined by taking the total settlement ($6,700,000) and deducting the Liquidated Damages remission ($2,389,572) and the amount due to other subcontractors ($2,006,637), leaving a net of $2,303,791. This net amount should then be divided according to the proportionate share of the combined AMEC / ROSH claims. Since ROSH's claim is 12.48% of the total of both parties' claims, ROSH's proper share of the settlement is $287,594, less $11,888 in legal fees, for a net amount due from AMEC to ROSH of $275,706.

WHEREFORE, plaintiff ROSH Construction, Inc. demands judgment against defendant AMEC Construction Management, Inc. as follows:

A. Pursuant to Count I, in the amount of $21,084; and

B. Pursuant to Count II, in the amount of $38,618; and

C. Pursuant to Count III, in the amount of $97,183; or in the Alternative;

D. Pursuant to Count IV, in the amount of $275,706, plus;

E. Upon prevailing on any of the foregoing, an additional award of plaintiff's actual attorneys' fees and expenses; and

F. An award of costs of suit, plus such additional relief as this Court may deem just and proper.

ROSH CONSTRUCTION, INC.

Philip C. Jones, D.C. Bar # 196097
Michael J. Schrier, D.C. Bar # 444693
BELL, BOYD & LLOYD, LLP
1615 L Street NW, Suite 1200
Washington, D.C. 20036
Phone: (202) 466-6300
Fax: (202) 835-4133
pjones@bellboyd.com

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

ROSH Construction, Inc.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Anne Arundel
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Philip C. Jones, # 196097
BELL, BOYD & LLOYD, LLP
1615 L Street, NW, # 1200
Washington, D.C. 20036
(202) 466-6300

**DEFENDANTS**

AMEC Construction Management, Inc.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT City of New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES

(PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. *Antitrust***

- ☐ 410 Antitrust

**○ B. *Personal Injury/ Malpractice***

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. *Administrative Agency Review***

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. *Temporary Restraining Order/Preliminary Injunction***

**Any nature of suit from any category may be selected for this category of case assignment.**

***(If Antitrust, then A governs)***

**◉ E. *General Civil (Other)*** **OR** **○ F. *Pro Se General Civil***

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Subcontractor claim against General Contractor - 28 U.S.C. 1332 (Diversity)

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** 335,408 Check YES only if demanded in complaint **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

**DATE** May 7, 2007 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**

Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**ROSH Construction, Inc.**
103 Norman Rd · Suite B, Pasadena, MD 21122
(410) 360-7500
FAX (410) 360-7579

RECEIVED NOV 18 2002

November 15, 2002

**Mark McGaughan**
AMEC
7101 Wisconsin Avenue, #1403
Bethesda, MD 20814

**RE: USCS / ICC Project**

Dear Mark:

Enclosed is our March 18, 2002 letter, with attachments, regarding our delay / acceleration claim on the above project. Please reference as well previous correspondence from ROSH to AMEC dated April 12, 2002 and April 19, 2002 regarding this same subject. Our claim and information therein remains valid.

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

If you have any questions, please do not hesitate to call.

Sincerely,
**ROSH Construction, Inc.**

Ron Shapiro, P.E.
President

RS/wdk

enclosures

cc: Joel Rubenstein

**ROSH Construction, Inc.**
103 Norman Rd · Suite B, Pasadena, MD 21122
(410) 360-7900
FAX (410) 360-7979

March 18, 2002

Mark McGaughan
AMEC
7101 Wisconsin Avenue, #1403
Bethesda, MD 20814

RE: USCS/ICC Project - Delay/Acceleration Directive

Dear Mark:

As you know from our many conversations and correspondences over the past year, ROSH has complied with AMEC's acceleration directive. We have worked our manpower overtime, we have increased manpower, we have added supervision, and as a result together with the start / stop nature of the work, there were inefficiencies which we suffered, all of which lead to the following additional costs:

- ***Overtime***
  In accordance with your acceleration directive dated January 5, 2001, we put our crew on working a minimum of a 48 hour work week. This included 10 hour days and Saturdays and an occasional Sunday. Also during the course of the project, you issued several specific directions as to what areas and when to work overtime. As you can see from the attached chart showing our weekly manpower in man hours for the year 2001, there was a significant amount of overtime expended, particularly in the first half of the year. As no overtime was anticipated on this project, all of the costs associated with this overtime are a direct consequence of your directive.

  The costs of this overtime is $129,600 computed by multiplying the 1,440 hours of overtime worked times the previously established overtime rate.

- ***Added Supervision***
  Also in accordance with your direction of January 5, 2001 and subsequent directives from you, we increased our manpower significantly. Please refer to our chart showing the labor costs incurred over the course of the project on an annual basis. As you can see, there was a dramatic increase in 2001 over any of the previous years. A normal distribution of manpower would be in the form of a bell curve. As a result of this added manpower, the workload became more than one supervisor could handle and we had to add an additional non working supervisor, the cost of which certainly was not anticipated in the original subcontract and results directly from your directives.

  The cost of this additional supervision is $120,000 based on 2,000 hours for one year times the previously agreed to regular rate.

- *Inefficiency*

  As a result of having to hire many more workers at one time and trying to control them and work in many different areas concurrently, significant inefficiencies were experienced. Also, as you can see from our weekly manpower chart, the total number of man hours worked per week fluctuated and there were many spikes and valleys due to having to proceed in certain areas and then having to stop and cut back so other trades could do their work, perhaps work in areas out of sequence, and such.

  As a basis of measurement, we used a comparison of the ratio of the costs for CC#3 work which was primarily done in 2001 compared to the costs of CC#2 work, the majority of which was done prior to 2001 and found there to be a 19% increase. By multiplying the regular hourly rate times the total hours for 2001, less the overtime hours and less the supervisor's hours which yields a net effected number of hours being 19,680, results in a cost of inefficiency of $224,352.

Accordingly, please consider the foregoing as our claim for additional compensation due to disruption, acceleration, and inefficiencies. The total amount claimed is $473,952.00.

Enclosed for your use and reference are two color copies of charts labeled ROSH Construction, Inc., ICC/CW/USCS Labor Costs and ROSH Construction, Inc., ICC/CW/USCS Weekly Manpower for 2001.

For your ready reference, we have enclosed a copy of our March 7, 2001, letter to you which remains applicable.

We would appreciate being advised concerning when the overall claim has been completed, and we would like to receive a copy of same. We further request the opportunity to participate in all settlement meetings pertaining to ROSH's portion of the overall claim as well as any settlement meetings dealing with "global settlement." We specifically ask that our claim not be compromised or settled without our express authorization. We look forward to a prompt resolution of this matter so we can be reimbursed for costs which have already been incurred.

Sincerely,
**ROSH Construction, Inc.**

Ron Shapiro, P.E.
President

RS/wdk


ROSH Construction, Inc.
ICC/CW/USCS labor costs
17%
37%
labor costs
44%
2%
CC#3 extras
CC#3 base & TFO
CC#2 PTTFO & extras
CC#2 base & TFO
1997
1998
1999
2000
2001


ROSH Construction, Inc.
ICC/CW/USCS weekly manpower for 2001
week OT hours
week reg hours
total hours for 2001
21,680
1,440
man hours
0
100
200
300
400
500
600
700
25-Dec
1-Jan
8-Jan
15-Jan
22-Jan
29-Jan
5-Feb
12-Feb
19-Feb
26-Feb
5-Mar
12-Mar
19-Mar
26-Mar
2-Apr
9-Apr
16-Apr
23-Apr
30-Apr
7-May
14-May
21-May
28-May
4-Jun
11-Jun
18-Jun
25-Jun
2-Jul
9-Jul
16-Jul
23-Jul
30-Jul
6-Aug
13-Aug
20-Aug
27-Aug
3-Sep
10-Sep
17-Sep
24-Sep
1-Oct
8-Oct
15-Oct
22-Oct
29-Oct
5-Nov
12-Nov
19-Nov
26-Nov
3-Dec
10-Dec
17-Dec

March 7, 2001

**Mark McGaughan**
AMEC
USCS / ICC Project
7101 Wisconsin Ave., #1403
Bethesda, MD 20814

**RE: Fax dated February 15, 2001**

Dear Mark:

Confirming my prior letters dated January 25, 2001, February 14, 2001, and February 15, 2001, this is to reiterate that the delays, impacts, disruption and resultant directed accelerations are not due to any action, inaction, or performance failure by ROSH, but rather were caused by other parties. In short, the delays, impacts, and disruptions have been caused by unforeseeable causes beyond the control and without the fault or negligence of ROSH.

I understand that it is your position that the government is responsible for the increased costs which ROSH is experiencing and will continue to experience, including, but not limited to, overtime costs and loss of productivity associated with the acceleration effort. In accordance with the Subcontract Paragraphs 8(d) and 11(a) ROSH will pursue recovery for its claim on a pass-through basis.

We are of course hopeful that this matter can be fully resolved on this basis, but believe it is only fair to advise you that ROSH is entitled to full compensation for the costs which will be submitted. Therefore, in accordance with Paragraph 11(a) and 11(d), to the extent that such recovery is denied by the owner, ROSH will have no choice but to look to you and/or your surety for recovery. In that regard, please note that our letter of January 25, 2001 fully complies with the 11(b) notice requirement with respect to all additional costs incurred and to be incurred as a result of your acceleration directive. This letter and my letters of February 14, 2001 and February 15, 2001, though not required, constitute additional and continuing notice of our claim.

Sincerely,
**ROSH Construction, Inc.**

Ron Shapiro, P.E.
President

December 20, 2002

Mark McGaughan
AMEC
7101 Wisconsin Avenue, #1403
Bethesda, MD 20814

***FAX No. 301-657-3375***

**RE: USCS / ICC - Acceleration Directive**

Dear Mark:

As requested by you and Jim Brogan of AMEC, please be advised of the following with respect to our acceleration claim:

1. **Overtime**: The 1440 hours for which you are requesting back up can be verified by the certified payrolls which is the data used to generate the charts which were included with our letter. An compiled copy of the 2001 certified payrolls, which were sent to you regularly during the course of the project will be sent to you under separate cover after the first of the year.

2. **Added Supervision**: The individual added was Lyndon Albery. He was actually added during part of the TFO work on the ICC side as provided for in the negotiations for that work. He is currently paid at $1.00 over scale, plus he gets company paid health insurance, and a company vehicle with the attendant expenses for that. He also gets paid vacation each year. His time can be verified from the certified payrolls.

3. **Inefficiency**: Our comparison using CC#2 as the measured mile is based on the following quantities establishing the correlation:

| Description | CC#2 TOTAL | CC#3 TOTAL | CC#2 % of TOTAL | CC#3 % of TOTAL |
|---|---|---|---|---|
| door leaves | 1554 | 1607 | 49.16% | 50.84% |
| glass & glazing | | | | |
| vision lite | 237 | 124 | 65.65% | 34.35% |
| transoms | 156 | 1 | 99.36% | 0.64% |
| HM borrowed lites | 6 | 2 | 75.00% | 25.00% |
| interior clerestory | 93 | 114 | 44.93% | 55.07% |
| round decorative windows | 7 | 6 | 53.85% | 46.15% |
| meeting room walls | 24 | 14 | 63.16% | 36.84% |
| AV projection windows | 2 | 0 | 100.00% | 0.00% |
| fire ext's and cabinets | 166 | 171 | 49.26% | 50.74% |
| traffic impact doors | 1 | 2 | 33.33% | 66.67% |
| projection screens | 7 | 1 | 87.50% | 12.50% |
| monitor arm | 2 | 0 | 100.00% | 0.00% |
| mail slot or package drop | 1 | 1 | 50.00% | 50.00% |
| pass-thru window | 1 | 0 | 100.00% | 0.00% |

note that totals include TFO but not PTTFO

**Mark McGaughan**
AMEC
re: **USCS / ICC - Acceleration Directive**



Having established the correlation that CC#2 is the measured mile for CC#3 (in fact, CC#2 might be slightly greater) and by comparing the percentile labor costs of 37% and 44% for CC#2 and CC#3 respectively, the following calculation determines the value of the inefficiency.

| | |
|---|---|
| straight time hours for 2001 | 21,680 |
| straight time of overtime hours for 2001 | 1,440 |
| less supervisors hours | (2,000) |
| net affected hours | 21,120 |
| | |
| previously established hourly rate | $60.00 |
| inefficiency factor [(44% - 37%) / 37%] = | 19% |
| inefficiency hourly rate | $11.40 |
| | |
| inefficiency hourly rate times net affected hours | $240,768 |

Accordingly, this should complete the information you require and it corresponds with the letters and attachments previously forwarded to you.

These amounts total over $400,000 and represents real costs incurred by us. To the extent that the government disallows your claim for the acceleration or a portion thereof, we reiterate our position that AMEC is responsible to ROSH for these added costs in that we did not delay or accelerate the job other than at your direction.

If you have any other requirements, please feel free to call. Also, please keep us advised as to the status of the overall claim.

Sincerely,
**ROSH Construction, Inc.**

Ron Shapiro, P.E.
President

**1/30/03**

**SETTLEMENT AGREEMENT AND RELEASE**

THIS SETTLEMENT AGREEMENT AND RELEASE ("Agreement") is made this 4th day of FEBRUARY, 2003, among ROSH Construction, Inc. ("ROSH"), AMEC Construction Management, Inc. ("AMEC") (formerly known as Morse Diesel International, Inc.), and Seaboard Surety Company, St. Paul Fire and Marine Insurance Company and American Home Assurance Company (the "Sureties").

WHEREAS, ROSH entered into a subcontract with AMEC under Contract No. DACA31-98-D-0059 with the United States Government to perform certain work at the Pentagon on the Wedge I Renovation, in Arlington, Virginia; and ROSH entered into a subcontract with AMEC on the ICC/CW/USCS Project, No. GS-11P96MKC0015 for building modernization (collectively, the "Subcontracts"); and

WHEREAS, disputes have arisen between the parties and against the Owners on the Pentagon and ICC projects (collectively "the Projects"); and

WHEREAS, ROSH initiated an action in the United States District Court for the Eastern District of Virginia, ROSH Construction, Inc. v. AMEC Construction Management, Inc., et al., CA No. 02-1213-A (the "Pending Litigation") seeking damages that are more fully set forth in ROSH's complaint on the Pentagon Wedge I Project;

WHEREAS, the parties hereto also desire to settle the Pending Litigation and finally resolve all disputes on the Projects in their entirety.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants, promises, and agreements set forth below, the adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **MUTUAL RELEASES**

A. **ROSH RELEASE.** ROSH, including all of its affiliated and predecessor entities, does hereby release and forever discharge AMEC, its affiliated and predecessor entities, and all of each of their authorized representatives, authorized agents, officers, employees, principals, directors, board or committee members, trustees, attorneys, sureties, co-sureties, insurers, successors, assigns or affiliated companies, from any and all claims, debts, liabilities, obligations and causes of action, appeals, suits, claims for interest and demands of any kind whatsoever, in law or equity, whether known or unknown, contingent or matured, and whether within the contemplation of the parties or not, which ROSH and/or its affiliated or predecessor entities, subcontractors and suppliers may have had, now has, or may have in the future, against AMEC arising under or relating in any way to the Projects, the Subcontracts, or related, in any way, to the claims asserted in the Pending Litigation, subject to Exhibit A hereto.

B. **AMEC RELEASE.** AMEC, including all of its affiliated and predecessor entities, does hereby release and forever discharge ROSH and all of its affiliated and predecessor entities, authorized representatives, authorized agents, officers, employees, directors, attorneys, insurers, sureties, co-sureties, successors and assigns, or affiliated companies, from any and all claims, debts, demands, liabilities, obligations, causes of action, appeals, suits, claims for interest and demands of any kind whatsoever, in law or equity, whether known or unknown, contingent or matured, and whether within the contemplation of the parties or not, which AMEC and/or its affiliates and predecessor entities may have had, now has, or may have in the future, against ROSH arising under or relating in any way to the Projects, the Subcontracts, or related to the claims asserted in the Pending Litigation. This Agreement, including this Paragraph No. 1(B) shall not limit ROSH's responsibility under the Subcontracts for warranty items and latent defects in the

work performed on the Projects pursuant to the terms of the Subcontracts, but such warranties are not extended nor enlarged hereby.

2. **PAYMENT OBLIGATION.** AMEC shall credit ROSH the amount of Twenty-Thousand and 00/100 Dollars ($20,000.00) (the "Settlement Amount") pursuant to the terms in Paragraph 3, below. It is expressly agreed and understood that the Settlement Amount shall constitute the sole remaining payment by AMEC to ROSH related to the Subcontracts and the Projects. ROSH agrees that it shall not be entitled to any additional compensation of any kind from AMEC and shall look exclusively to the GSA on the ICC Project for any additional funds. To the extent GSA makes payment to AMEC on behalf of Rosh on the ICC Project, AMEC shall make such payments to Rosh in accordance with Exhibit A. ROSH agrees that it shall not look to the Department of Defense on the Pentagon Wedge I Project for any further payment.

3. **DISMISSAL OF PENDING LITIGATION.** ROSH agrees to dismiss the Pending Litigation, in its entirety, with prejudice, with each side to pay its own fees and costs. The Settlement Amount will be due within three (3) business days of the dismissal of the Pending Litigation.

4. **ROSH'S INDEMNIFICATION OF AMEC.** ROSH hereby agrees that it shall defend, indemnify, and hold harmless AMEC from any and all claims, demands, liens, suits and/or causes of action of any kind, including actual attorneys' fees and expenses, asserted by any of ROSH's subcontractors, laborers, materialmen, or suppliers, relating to the Subcontracts or work performed (or material supplied) for or on the Projects (collectively, "Matters"). In any such Matters, AMEC shall immediately tender its defense to ROSH and ROSH shall have the right to select counsel to represent AMEC, subject to AMEC's consent, not to be unreasonably withheld, and ROSH may prosecute, defend, or settle all Matters in its sole discretion; provided, however, that

AMEC shall not in any way be liable for any portion of the resulting settlement, compromise or resolution. AMEC shall cooperate fully with ROSH and make available all relevant documents and witnesses in the defense of Matters. ROSH will participate with AMEC in pursuing certain claims against the GSA on the ICC Project and will cooperate in this presentation. AMEC and ROSH have liquidated those claims as set forth in the Joint Prosecution and Close Out Agreement appended hereto as Exhibit A.

5. **REFERENCES.** ROSH and AMEC each hereby agree that they will not make, or cause to be made, disparaging comments regarding each party's performance of its obligations under the Subcontracts and on the Projects, including each Party's officers, directors, shareholders and employees.

6. **AUTHORITY.** The parties expressly represent and warrant that they have entered into this Agreement voluntarily, with proper authority, and without any reservation. Each party acknowledges that it has had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement and agrees that neither this Agreement, nor the settlement set forth herein, is the result of fraud, duress, coercion, or undue influence on the part of any other party or their counsel, and acknowledge that each has received all information and documentation necessary to permit the party to make fully informed decisions with respect to all aspects of this Agreement. The undersigned signatories represent and warrant that they are authorized to execute this Agreement.

7. **ENTIRE AGREEMENT.** This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges all prior discussions between them, and the parties shall not be bound by any conditions, definitions or representations with respect to the subject matter of this Agreement other than expressly provided for in this

Agreement or as duly set forth on or subsequent to the date hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. This written agreement embodies all the understandings and obligations between the parties with respect to the subject matter hereof and is signed by duly authorized representatives of each party.

8. **ENFORCEABILITY.** The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

9. **NON-WAIVER.** No waiver of any provision of this Agreement shall be valid unless the same is in writing and signed by the party against whom it is sought to be enforced. No waiver of any provision of this Agreement will be decreed a waiver of any other provision of this Agreement.

10. **GOVERNING LAW.** This Agreement shall be governed by, enforced under and construed in accordance with the laws of the District of Columbia. In any and all actions between the parties enforcing or declaring rights under this Agreement, the prevailing party shall be entitled to the award of all costs and expenses (including actual attorneys' fees) incurred and paid in such actions. The court sitting without a jury shall try all such actions, and the parties therefore irrevocably waive trial by jury.

11. **EFFECTIVE DATE.** The effective date of this Agreement shall be February __, 2003.

12. **PARTIES IN INTEREST.** This Agreement shall inure only to the benefit of and be binding upon the parties hereto and all their successors and assigns, including AMEC's Sureties. ROSH and AMEC expressly state, affirm and acknowledge that they and the Sureties are the only

beneficiaries of the terms of this Agreement and that there are no third-party beneficiaries of this Agreement (or any part hereof) either express or implied.

**13.** **AMENDMENT.** This Agreement shall not be modified or amended except by a writing signed by all parties hereto.

**14.** **COUNTERPARTS.** This Agreement may be executed in two or more counterparts. Each counterpart, when executed and delivered, shall be deemed an original and, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement, intending to be bound thereby.

**ROSH CONSTRUCTION, INC.**

_______________, by: Ron Shapiro, President

Date: 2/24/03

State of Maryland )
) To wit:

On this 24th day of February, 2003, before me personally appeared Ron Shapiro, President of ROSH Construction, Inc., to me known to be the same person described in and who executed the above instrument and he acknowledged to me that he executed the same.

_______________
Notary Public

Subscribed and sworn to before me this 24th day of Feb, 2003 in the State of Maryland. My commission expires: 03/2/04.

WENDY D. KOWAL NOTARY PUBLIC ANNE ARUNDEL CO., MD

**AMEC CONSTRUCTION MANAGEMENT, INC.**

By and on behalf of itself and its Sureties ______________________, by:
Mark McGaughan, Vice President

Date: FEBRUARY 4, 2003

State of Maryland )
) To wit:

On this 4th day of February, 2003, before me personally appeared Mark S. McGaughan, Vice President of AMEC Construction Management, Inc., to me known to be the same person described in and who executed the above instrument and he acknowledged to me that he executed the same.

Sherry L. Bukowski
Notary Public

Subscribed and sworn to before me this 4th day of Feb., 2003 in the State of Maryland. My commission expires: 2/17/03.

SHERRY L. BUKOWSKI
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 17, 2003

**EXHIBIT A**

**JOINT PROSECUTION AND CLOSE OUT AGREEMENT**

**THIS AGREEMENT**, made this 4th day of February, 2003, between ROSH Construction, Inc. ("Subcontractor" or "ROSH") and AMEC Construction Management, Inc. ("AMEC").

**RECITALS**

a. AMEC entered into a contract ("Contract") with the United States General Services Administration ("GSA"), No. GS-11P96MKC0015, for the renovation of the ICC/USCS/CW Buildings Modernization in Washington, D.C. ("Project").

b. AMEC and Subcontractor entered into a subcontract agreement dated February 26, 1997 ("Subcontract") whereby Subcontractor agreed to perform certain work on the Project.

c. During the performance of the contract work, Subcontractor incurred extra costs as a result of various acts and omissions of GSA, its agents, assigns or privies, and/or errors, omissions, or discrepancies in the Contract Documents.

d. The current Subcontract balance (inclusive of all funds paid by GSA to date and all AMEC backcharges to Subcontractor) is ($20,000) (negative Twenty Thousand Dollars).

e. Both AMEC and Subcontractor wish to resolve all matters between themselves and cooperate in presenting Subcontractor's claims to GSA, along with AMEC's and its other subcontractors' claims, and this Agreement sets forth this cooperation.

f. In consideration of the mutual obligations set forth herein, it is therefore now agreed as follows:

# AGREEMENT

1a. Payment. AMEC agrees to pay to ROSH those funds paid by GSA with regard to the items listed in 1b., below.

1.b. Disputes To Be Presented To GSA. AMEC will assist ROSH in pursuing the following claims exclusively from GSA to the extent Rosh submits a contractually compliant written request for Contracting Officer's Final Decisions, unless otherwise stated:

- ROSH's 14 unpaid invoices totaling $8,540 (excluding items 1 and 16 below):

ROSH CONST. INC.

13 of 14 — Contract Status = ICC/CI/USCS — ROSH Construction, Inc. 4/8/02 1:37 PM

| | Item # | amount | date submitted | comments | |
|---|---|---|---|---|---|
| 1 | inv# 99122001 ✓ | $ 240.00 | 12/28/99 | approved by AMEC letter 3/4/02 OK | |
| 2 | inv# 00111526 ✓ | $ 560.00 | 11/15/00 | authorized by Jim Lasher [illegible] | [illegible] |
| 3 | inv# 00112442 ✓ | $ 810.00 | 11/24/00 | authorized by Bruce Parker, receiving materials for Chil - door louvers & panels | |
| 4 | inv# 01101212 ✓ | $ 120.00 | 10/12/01 | authorized by Bruce Parker EXQUISITE | Fund |
| 5 | inv# 01110517 ✓ | $ 270.00 | 11/5/01 | authorized by Bruce Parker EXQUISITE | [illegible] |
| 6 | inv# 01110318 ✓ | $ 90.00 | 11/5/01 | authorized by Bruce Parker | |
| 7 | inv# 01112628 ✓ | $ 360.00 | 11/26/01 | approved by AMEC letter 3/4/02 NSC | |
| 8 | inv# 01120733 ✓ | $ 540.00 | 12/7/01 | authorized by Bruce Parker & Dick Ward SWD | |
| 9 | inv# 01120735 ✓ | $ 300.00 | 12/7/01 | authorized by Jim Lasher [illegible] | |
| 10 | inv# 02010339 ✓ | $ 1,100.00 | 1/3/02 | authorized by Bruce Parker NSC | |
| 11 | inv# 02010340 ✓ | $ 240.00 | 1/3/02 | authorized by Bruce Parker | |
| 12 | inv# 02010341 ✓ | $ 120.00 | 1/3/02 | authorized by Bruce Parker CSH | |
| 13 | inv# 02012348 ✓ | $ 2,280.00 | 1/23/02 | authorized by Bruce Parker [illegible] | [illegible] |
| 14 | inv# 02010342 ✓ | $ 1,800.00 | 1/3/02 | authorized by Bruce Parker CC Work [illegible] | [illegible] |
| 15 | inv# 02022070 ✓ | $ 150.00 | 2/20/02 | authorized by Bruce Parker | |
| 16 | inv# 02031878 ✓ | $ 3,934.00 ✓ | 2/18/02 | [illegible] ASZZ & BSZA per Mike Kuyman. | OK |
| | | $ 12,914.00 | | | |

- ROSH's claims for acceleration totaling $408,452;
- ROSH's claim of a global settlement and compensation therefor in the amount of $29,000. ROSH claim if no global settlement of $61,490;
- ROSH's disputed allocation on the ICC Punchlist of $77,503;
- ROSH's disputed allocation on the USCS Punchlist of $72,473;

- ROSH's disputed allocation for remission of Liquidated Damages in the amount of $44,233 (for which Rosh need not submit a request for Contracting Officer's Final Decision);
- CE Amount Disagreements:

ROSH will pursue the following amounts from GSA which amount to $21,607:

| Item | Paid | Rosh claimed amount | Amount due per AMEC | Reasons - Comments |
|---|---|---|---|---|
| | | | | |
| CE 840 | $10,370 | $23,876 | $16,013 | $5,643 credit due Rosh for B. Werther services under door dispute |
| CE 967 | $400 | $1,550 | $400 | Rosh submitted revised proposal - GSA accepted original $400 proposal. Rosh must pursue GSA under Disputes provision. |
| CE 8012 | $1,050 | $4,335 | $1,050 | Rosh must pursue GSA under Disputes provision. |
| CE 6015 | $0 | $3,600 | $0 | Rosh must pursue GSA under Disputes provision. |
| AMEC 250.1 - Rosh extra work | $115,048 | $115,357 | $115,048 | Rosh performed work that was to be backcharged to all subcontractors. Rosh's portion of the backcharge to all subs is $309 |
| CE 580 | $0 | $600 | $0 | Rosh must pursue GSA under Disputes provision. |
| CE 661 | $0 | $4,800 | $0 | Rosh must pursue GSA under Disputes provision. |
| | | | | |
| Total | $126,868 | $154,118 | $132,511 | $5,643 |

- ROSH claims of $29,501 for TSI refabrication, mirror clips and hardware removal for peel away for level 5 PTTFO;
- CE #261/PC 545 unilaterally withheld by GSA for expansion joint in the amount of $255,964;

- ROSH agrees that from the monies recovered under this Section 1.b, TSI will be paid on its claim the same proportionate share as received by ROSH, inasmuch as GSA's claim for deficient punchlist items (for which GSA has provided no backup), and reduced payments to date to Rosh, all of which are disputed by Rosh, may be due to the fault or responsibility of TSI.

ROSH will look exclusively to GSA for all items listed under 1b, above, and AMEC shall have no liability whatsoever for any of these items at any time, other than to make payment in accordance with the terms of this Agreement.

2. AMEC and Subcontractor agree that AMEC shall assist Subcontractor in presenting to GSA Subcontractor's claims as set forth in lb, above, and will use all reasonable efforts to achieve a settlement of Subcontractor's claims through negotiations with the GSA. Subcontractor, at its cost and expense, shall cooperate with AMEC by providing information, documents and personnel as requested by AMEC for purposes of resolving Subcontractor's claims, AMEC's claims, and AMEC's other subcontractors' claims against the GSA. Such cooperation will include participation in discussions with GSA when and as requested by AMEC. Subcontractor agrees not to discuss the Project with the media or any representatives of the GSA without the prior knowledge and consent of AMEC.

3. Because of their common interest in presenting Subcontractor's claims to GSA, Subcontractor and AMEC agree that they may exchange mental impressions, ideas and strategies (written or verbal) about the claims and that such communications are protected by the joint prosecution/joint defense privileges, so that such communications may not be discovered by third parties.

4. If a negotiated settlement cannot be reached with GSA, and an appeal, law suit or other proceeding with regard to Subcontractor's claims against the Owner is instituted by AMEC, Subcontractor agrees that counsel for AMEC will have ultimate control of the conduct of the matter and further agrees, at Subcontractor's cost and expense, to furnish to such counsel any and all documents in support of Subcontractor's claims and to make available any and all witnesses deemed necessary by AMEC. AMEC will bear the cost of the lead legal team initially, however, Subcontractor agrees that AMEC will be reimbursed for Subcontractor's pro rata share for such cost out of any recovery obtained from GSA on Subcontractor's behalf. Subcontractor's pro rata share of attorneys' fees will be determined by dividing Subcontractor's claim by the total claim times the attorneys' fees.

5. AMEC agrees to keep Subcontractor apprised of all significant developments and, where feasible, to afford Subcontractor the opportunity to review all significant pleadings, memoranda, and other such documents relating to Subcontractor's claims, and agrees that Subcontractor may, at its own cost and expense, suggest modifications or supplements to the same.

6. In the event further proceedings are instituted with respect to Subcontractor's claims against the GSA, or in the event of a settlement, AMEC will provide Subcontractor notice of such action within a reasonable time prior to taking such action. Subcontractor's right to recovery on any claims it may have with respect to the Project is limited to that amount which is recovered by AMEC from GSA based directly on Subcontractor's claims, less AMEC's mark-up and the amount reimbursed to AMEC in accordance with Paragraph 4 above. AMEC shall pay such amount recovered by AMEC from GSA promptly to Subcontractor seven (7) days after payment by GSA. In the event that any settlement, judgment or award is in a form such that the amount attributable directly to Subcontractor's claims cannot be readily determined, AMEC may in good faith allocate such settlement, judgment or award to Subcontractor based upon AMEC's

reasonable determination of the amount attributable to Subcontractor's claims using the same proportionate share of the award, ~~less the amounts listed in 1a above,~~ to pay Subcontractor as Subcontractor's proportionate share is of the total claims. So long as AMEC acts in accordance with this Agreement and in good faith with respect to presenting Subcontractor's claims and with respect to allocation of monies paid to Subcontractor, the final amounts allocated to Subcontractor shall be binding on Subcontractor.

7. This Agreement shall be governed by, enforced under, and construed in accordance with the laws of the District of Columbia. In any and all actions between the parties enforcing or declaring rights under this Agreement, the prevailing party shall be entitled to the award of all costs and expenses (including actual attorneys' fees) incurred and paid in such actions. The court sitting without a jury shall try all actions, and the parties therefore irrevocably waive trial by jury. Notwithstanding any dispute that may arise hereunder, AMEC agrees that all undisputed amounts will be released to Rosh pursuant to paragraph 6, above.

8. Nothing in this Agreement obligates AMEC to pursue further proceedings on behalf of Subcontractor. If AMEC elects not to pursue further proceedings, AMEC will consult with Subcontractor regarding allowing Subcontractor, in AMEC's name, to institute further proceedings, at Subcontractor's cost and expense, against GSA. AMEC, in its sole discretion, shall determine whether Subcontractor may institute or pursue further proceedings in AMEC's name.

9. Subcontractor, by the terms of this Agreement, has reserved and preserved its rights to have its claims pursued through AMEC against GSA. Except for such claims, Subcontractor hereby declares that all causes of action, liabilities, and demands, rights or claims, including those arising out of or related to any performance or payment bonds or lien statutes, which it ever had, now has, or might have in the future against AMEC, its successors, assigns and sureties, its or their agents, employees, shareholders, officers and directors with respect to

the Subcontract, the Contract, and the Project, whether now known or unknown, existing or arising in the future, are fully satisfied and discharged; provided, however, that nothing in this Agreement releases AMEC's obligation to pay to Subcontractor its proportionate share of any Change Orders paid by the Owner after the date set forth above, and to pay Subcontractor on its claims in accordance with this Agreement.

10. Subcontractor will obtain its surety's consent to this Agreement.

11. Except as expressly modified by the terms of this Agreement, the Subcontract remains in full force and effect.

12. Prior to AMEC having any obligation to submit Subcontractor's claims to GSA, Subcontractor must certify to AMEC, as follows, with respect to its claims:

> Subcontractor hereby certifies that its claims are made in good faith, the supporting data are accurate and complete to the best of Subcontractor's knowledge and belief, the amounts requested accurately reflect the amount for which Subcontractor believes GSA is liable, and the certifier is duly authorized to certify its claims on behalf of the Subcontractor.

Subcontractor furthermore agrees that, in consideration of AMEC's submitting Subcontractor's claims to the GSA, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Subcontractor hereby agrees to indemnify AMEC for all costs and expenses, including attorneys' fees and costs, incurred by AMEC arising from any allegation that the certification or sponsorship by AMEC of Subcontractor's claims was improper, false or contrary to applicable standards. AMEC will only certify a claim it believes is being made in good faith. Separate consideration has been paid by AMEC for this indemnity.

13. Nothing in this Agreement shall release, nor is anything intended to release, GSA, its agents, successors, assigns, privies, or contractors other than AMEC.

14. Other than as set forth in Paragraph 7 above, any dispute or controversy between AMEC and Subcontractor, in any way relating to or involving this Agreement, shall be decided by the procedures as set forth in the Subcontract.

15. The parties agree that the preamble to this Agreement is an express part of this Agreement.

16. This Agreement is binding on the trustees, if any, successors and assigns of AMEC and Subcontractor.

**IN WITNESS THEREOF,** the parties hereto have, on the date set forth, caused this Agreement to be executed by their respective fully authorized officers, and said officers have authority to sign this Agreement on behalf of their respective companies.

AMEC Construction Management, Inc. — Date: 2/4/03

ROSH Construction, Inc. — Date: 3/3/03

[ROSH's Surety – Please provide Name] — Date



DC #136634 v1
February 4, 2003

# CONSENT OF SURETY

Bond No. 04-0120-10829-97-0

PROJECT: ICC/USCS/CW BUILDINGS MODERNIZATION WASHINGTON, D.C.

PRINCIPAL: ROSH CONSTRUCTION, INC.

OBLIGEE: AMEC CONSTRUCTION MANAGEMENT, INC.

In accordance with the provisions of the subcontract between Obligee and the Principal, Fidelity and Guaranty Insurance Company, as Surety, hereby agrees to the following:

Surety hereby consents to the Joint Prosecution and Close Out Agreement. This Consent and all prior or subsequent communications are made with an express reservation of all rights and defense that may be available to Fidelity and Guaranty Insurance Company and/or Rosh Construction, Inc., at law or in equity, under the terms and provisions of the bond and contract documents.

Signed, Sealed and Dated the 26th day of February, 2003.

FIDELITY AND GUARANTY INSURANCE COMPANY

By: [signature]

Diana L. Parker, Attorney-In-Fact

**St Paul Surety**

St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company
Seaboard Surety Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc
St. Paul Medical Liability Insurance Company.

**Bond No.** 04-0120-10829-97-0

**RIDER CONTAINING**
**DISCLOSURE NOTICE OF TERRORISM COVERAGE**

This disclosure notice is required by the Terrorism Risk Insurance Act of 2002. No action is required on your part. This Disclosure Notice is incorporated in and a part of the attached bond.

You should know that, effective November 26, 2002, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by the Terrorism Risk Insurance Act of 2002. Under this formula, the United States reimburses 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

There is a cap on our liability to pay for such losses if the aggregate amount of insured losses under the Act exceeds $100,000,000,000 during the applicable period for all insured and all insurers combined. In that case, we will not be liable for the payment of any amount which exceeds that aggregate amount of $100,000,000,000.

The portion of your premium that is attributable to coverage for acts of terrorism is $0.00.

**IMPORTANT NOTE: THE COST OF TERRORISM COVERAGE IS SUBJECT TO CHANGE ON ANY BOND THAT PREMIUM IS CHARGED ANNUALLY.**

SIGNED AND SEALED this 26th day of February, 2003

**SURETY:** [SEAL]

Signature: [signature]
Attorney-in-Fact

The St Paul

# POWER OF ATTORNEY

**Seaboard Surety Company**
**St. Paul Fire and Marine Insurance Company**
**St. Paul Guardian Insurance Company**
**St. Paul Mercury Insurance Company**
**United States Fidelity and Guaranty Company**
**Fidelity and Guaranty Insurance Company**
**Fidelity and Guaranty Insurance Underwriters, Inc.**

**Power of Attorney No.** 23115 **Certificate No.** 1555993

**KNOW ALL MEN BY THESE PRESENTS:** That Seaboard Surety Company is a corporation duly organized under the laws of the State of New York, and that St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, and that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, and that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc. is a corporation duly organized under the laws of the State of Wisconsin *(herein collectively called the "Companies")*, and that the Companies do hereby make, constitute and appoint

Mary Ann Marbury, Michael A. Walter, Bradley T. Senn, Deborah B. Brown, Diana L. Parker and Terry D. Reynolds

of the City of Columbia, State Maryland, their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety to, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**IN WITNESS WHEREOF**, the Companies have caused this instrument to be signed and sealed this 28th day of October, 2002.

WARNING: THIS POWER OF ATTORNEY IS INVALID WITHOUT THE RED BORDER

**Seaboard Surety Company**
**St. Paul Fire and Marine Insurance Company**
**St. Paul Guardian Insurance Company**
**St. Paul Mercury Insurance Company**
**United States Fidelity and Guaranty Company**
**Fidelity and Guaranty Insurance Company**
**Fidelity and Guaranty Insurance Underwriters, Inc.**

PETER W. CARMAN, Vice President

THOMAS E. HUIBREGTSE, Assistant Secretary

State of Maryland
City of Baltimore

On this 28th day of October, 2002, before me, the undersigned officer, personally appeared Peter W. Carman and Thomas E. Huibregtse, who acknowledged themselves to be the Vice President and Assistant Secretary, respectively, of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc.; and that the seals affixed to the foregoing instrument are the corporate seals of said Companies; and that they, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the names of the corporations by themselves as duly authorized officers.

**In Witness Whereof,** I hereunto set my hand and official seal.

My Commission expires the 1st day of July, 2006.

REBECCA EASLEY-ONOKALA, Notary Public

**SETTLEMENT TERMS SHEET**

This Settlement Terms Sheet is entered into between AMEC Construction Management, Inc. ("AMEC") and The General Services Administration ("GSA"), involving a resolution of all disputes on the project known as the ICC/CW/USCS project under Contract No. GS-11P-96MKC0015, except for CE 435.

1. Both AMEC and GSA have claims against each other on the referenced project, and have formally mediated their claims on December 21 and 22, 2005, March 16, 2006 and March 31, 2006, with the assistance and participation of The Honorable Martha DeGraff, as mediator.

2. During the same time period, the parties have also engaged in informal settlement negotiations.

3. Both the mediations and the informal settlement discussions have been conducted at arm's length and in good faith. Both AMEC and GSA have had the opportunity to present their positions, and there has been a full and complete opportunity for the parties to consider the positions of the other. Further, the mediator has been available to the parties for additional discussions and negotiations on an ongoing basis.

4. The GSA will pay to AMEC Six Million Seven Hundred Thousand Dollars ($6,700,000) in full and final resolution of all of AMEC's claims on the Project, including remission of liquidated damages, Two Million Three Hundred Thousand ($2,389,572) currently being held by GSA (the "Settlement Amount"), except for the CE 435 claim that will be litigated at the GSBCA.

5. Of the Settlement Amount, GSA apportions ($2,115,708) on the delay and acceleration claim as set forth in Schedule A. Schedule A will be made a part of any settlement agreement or contract modification between the parties. This allocation is based on, among other

things, audit of subcontractor claims, review by GSA legal counsel, and examination of subcontractor records and project documentation.

6. GSA will use its best efforts to issue a justification for this settlement as quickly as possible so as to facilitate prompt payment to the subcontractors listed in Schedule A. If payment is not made within 45 days of the date of GSA's settlement justification, interest will begin to accrue at the Treasury Rate on the Settlement Amount.

7. The GSA will issue contract modifications as necessary to effectuate this settlement. Specifically, GSA will issue a modification remitting all LDs.

8. The attorneys signing below have authority to bind their clients. Client signatures will be obtained promptly.

9. This Settlement Terms Sheet may be executed in counterparts.

Dalton F. Phillips, Esq.
For GSA
March 31, 2006

Barbara G. Werther
For AMEC Construction Management, Inc.
March 31, 2006

Bonnie Echoles, Contracting Off'r
For GSA
Date: 4/6/06

John B. Onnembo, Esq.
AMEC Construction Management, Inc.
Date: 4/5/06

**SCHEDULE A**

| | |
|---|---|
| Kirlin | $514,900 |
| Lorton | $ 99,197 |
| Rosh | $109,071 |
| Calvert | $ 23,540 |
| NFP | $148,419 |
| CEI | $ 37,260 |
| C&A | $ 10,631 |
| SECO | $366,135 |
| KCI | $ 6,505 |
| CJC | $219,175 |
| SIW | $ 30,556 |
| BPI | $550,319 |

**Apportionment of GSA Settlement**

| Punchlist calculation | | Submitted | Settled | Attorney | Total |
|---|---|---|---|---|---|
| BPI | $485,262 | $485,261.00 | $301,280.77 | $21,734 | $279,547.27 |
| C&A | $102,588 | $102,588.00 | $63,693.13 | $4,595 | $59,098.50 |
| SECO | $87,547 | $84,485.00 | $52,453.64 | $3,784 | $48,669.79 |
| CJC | $180,294 | $180,294.00 | $111,937.94 | $8,075 | $103,863.07 |
| CSS | $106,849 | $82,397.00 | $51,157.28 | $3,690 | $47,466.94 |
| KCI | $41,473 | $45,620.00 | $28,323.79 | $2,043 | $26,280.59 |
| JJK | $108,980 | $108,981.00 | $67,662.31 | $4,881 | $62,781.35 |
| Lorton | $228,979 | $228,979.00 | $142,164.67 | $10,255 | $131,909.33 |
| ROSH | $149,976 | $149,976.00 | $93,114.60 | $6,717 | $86,397.59 |
| SIW | $58,136 | $58,136.00 | $36,094.51 | $2,604 | $33,490.76 |
| chi | $16,542 | $16,542.00 | $10,270.32 | $741 | $9,529.45 |
| AMEC | | | | | |
| Subs total | | $1,543,259.00 | | | |
| | | | $0.00 | | |
| AMEC | $212,509 | $212,509.00 | $131,939.05 | $9,518 | $122,421.36 |
| 2.32% overhead | | | $0.00 | | |
| 10% profit | | | $0.00 | | |
| | | | $0.00 | | |
| | | | $0.00 | | |
| Subs & AMEC | | $1,755,768.00 | | | |
| | | | $0.00 | | |
| 10% commission on subs | | | $0.00 | | |
| 1.062% ins & bond | | | $0.00 | | |
| Total Submitted | | $1,755,768.00 | | | |
| Total Settled | | $1,090,092.00 | $1,090,092.00 | | |
| % settlement | | 0.620863349 | | | |

**% of Delay & LD's**

| Sub | Amount | | | |
|---|---|---|---|---|
| | Delay | LDs | | % of delay |
| J. J. Kirlin Delay/Acceleration claim dated 1/10/03 | $1,977,948 | $635,238 | $2,613,186 | 19.66% |
| Lorton Contracting Delay/Acceleration claim dated 11/22/02 | $367,395 | $92,927 | $460,322 | 3.46% |
| Rosh Construction Delay/Acceleration claim dated 3/18/02 | $403,968 | $38,618 | $442,586 | 3.33% |
| Calvert Masonry Delay/Acceleration claim dated 11/18/02 | $87,184 | $82,810 | $169,994 | 1.28% |
| National Fire Protection Delay/Acceleration claim dated 12/23/02 | $549,700 | $47,195 | $596,895 | 4.49% |
| Curtis Equipment Delay/Acceleration claim dated 12/13/02 | $251,710 | $10,875 | $262,585 | 1.98% |
| Collins and Aikman Delay/Acceleration claim dated 10/14/02 | $39,375 | $35,304 | $74,679 | 0.56% |
| Singleton Electric Delay/Acceleration claim dated 12/16/02 | $1,356,055 | $522,517 | $1,878,572 | 14.13% |
| K C Industries Delay/Acceleration claim dated 10/17/02 | $24,094 | $59,777 | $83,871 | 0.63% |
| C. J. Coakley Delay/Acceleration claim dated 12/10/02 | $811,759 | $225,991 | $1,037,750 | 7.81% |
| BPI Mechanical Delay/Acceleration claim dated 6/5/02 | $2,038,218 | $31,273 | $2,069,491 | 15.57% |
| Superior Iron Works Delay claim dated 1/3/03 | $163,745 | $52,831 | $216,576 | 1.63% |
| CHI | | $44,950 | $44,950 | 0.34% |
| NSC | | | | |
| FDN | | $7,735 | $7,735 | 0.06% |
| CSS | | $2,480 | $2,480 | 0.02% |
| Canning | | $11,209 | $11,209 | 0.08% |
| DA | | $36,381 | $36,381 | 0.27% |
| Expanko | | $2,449 | $2,449 | 0.02% |
| Key | | $6,355 | $6,355 | 0.05% |
| W&S | | $20,185 | $20,185 | 0.15% |
| Subtotal | $8,071,151 | $1,967,100 | | |
| AMEC | $2,832,042 | $267,472 | $3,099,514 | 23.32% |
| Total | $10,903,193 | $2,389,572 | $13,292,765 | 100.00% |